NELLIE E. JUDGE, Admx., *vs.* NARRAGANSETT ELECTRIC
LIGHTING Co.

PROVIDENCE—JULY 17, 1901.

PRESENT : Stiness, C. J., Tillinghast and Blodgett, JJ.

(1)  *Master and Servant.    Negligence.    Due Care.*

Plaintiff's intestate, a lineman, while at work at the top of an electric pole, received injuries resulting in his death, caused either by becoming grounded while in contact with a highly-charged wire, or else by making a short circuit so that the current went through his body.

After a verdict in plaintiff's favor, a new trial was granted on the ground that there was no evidence that intestate was in the exercise of due care at the time of the accident.  Upon the second trial a witness testified that he saw intestate working with the wires, shaking them out; that he saw him starting to go down, and next saw him falling.  The plaintiff was nonsuited on the ground that no evidence of due care was shown :—

*Held,* no error.

TRESPASS ON THE CASE for negligence.    The facts appear in the opinion.    Heard on petition of plaintiff for new trial after nonsuit.    New trial denied.

TILLINGHAST, J.    When this case was previously before us (See 21 R. I. 128), we granted a new trial on the ground that there was no evidence that the plaintiff's intestate, James J. Judge, was in the exercise of due care at the time of the happening of the accident which resulted in his death. Upon the second trial of the case the plaintiff was nonsuited on the same ground, and the case is now before us on the plaintiff's petition for a new trial.

(1)    The evidence produced at the second trial in behalf of the plaintiff, is substantially the same as that produced at the

first trial, with the exception of the testimony of David Sedder, who was not called as a witness at the first trial, but who was called and testified at the second trial. And it is claimed in behalf of the plaintiff that the testimony of this witness, taken in connection with the other evidence in the case, shows that the deceased was in the exercise of due care at the time when he received the shock which caused his death; or, at any rate, that there is now sufficient evidence of due care to entitle the plaintiff to go to the jury on that question. The witness, Sedder, testifies that he knew the deceased by sight, but "didn't know him to speak to." That on the day of the accident witness left the Regal Shoe Store on North Main Street, Providence, where he worked, at about half-past eleven to go to his dinner; that he went up to the corner of Haymarket street and stopped in the doorway of a doctor's office there to wait for a friend; that he happened to look across the street to a point near to the steps leading up to the State House, and saw a man on a telegraph pole or light pole shaking out the wires. In answer to the question "What did you see him do?" he replied, "I saw him take a pair of pliers out from about here [indicates] with his right hand, and he took hold of a wire and pulled it over—as much as to say—tried to straighten it, and shook it one way and shook it the other; then he put the pliers back; then he took another instrument out and I didn't see him use it. I didn't see him use the other instrument, but I saw him take it out. Q. Did you see him put it back? A. Yes, sir. Q. What did he do afterwards? A. After he put the instruments back he started to go down, and just as he was coming down I happened to look around the corner, and I saw him falling. As I saw him falling he fell with his back right down, face up, and as I ran over there there was a fireman came over from Haymarket street, and there were two other men came right over there at the time. I came to pick him up but the firemen they picked him up and carried him into the fire station, and I was not admitted. That is all I saw about it. Q. What pole was he on—do you know whether it was a light pole or a telegraph? A. I do not, sir. Q. Do you

know whether he was shaking out the electric light wires or the telegraph? A. No, sir; I don't know anything about that. Q. How long were you standing there after you saw him? A. I stood there while he was working there about five minutes, I should judge, at that time. I waited just about five minutes while he was working there as I watched him."

In cross-examination witness testified that he was waiting for his friend; that he didn't know it was Judge who was on the pole until he looked at him about five minutes after he fell. He further testified as follows: "Q. What part of the pole did he fall from when you saw him? A. Well, I could not just say; the wire was crossed there, there was one above—one pole—that is, from the top of the pole. Q. One what? A. Well, there is a cross there. Q. Cross-arm, do you mean? A. I don't know what they are called. Q. Crossed that way [indicates]? A. Yes, sir; goes across there. Q. That is, was up in the wires—on which pole was it? A. I don't know. Q. Now, had he gotten down below those wires when he fell? A. I would not say. I turned, as I said before, and just as I turned he was falling, and the only thing I heard afterwards he made a holler 'help' just as he was going down below. Q. When you saw him he was already falling, was he? A. Yes, sir. Q. You didn't see where he came from—where he started from? A. No, sir; I did not. Q. You are positive about that, are you? A. Yes, sir; very positive."

Such being the additional testimony, then, the only inquiry to be made is whether in view thereof the court erred in granting a nonsuit. We fail to see that the testimony referred to furnishes any evidence of due care on the part of deceased at the time of the accident. Taken in its most favorable light for the plaintiff, it simply shows that just before the accident the deceased was seen to be at work near the top of a telegraph pole on the east side of North Main street, near the steps leading up to the State House; that he was near the cross-bar on the pole in the midst of or in close touch with numerous wires, and was evidently engaged in

disentangling and re-adjusting one or more of these wires; but just how he was doing it and what care he was exercising no one knows.   Moreover, even assuming that at the moment he was seen to be shaking out the crossed wire he was exercising due care, it does not follow that shortly thereafter, when, according to the uncontradicted evidence of the experts who testified as to the manner in which he received his injuries, he either became grounded while in contact with a highly-charged wire, or else made a short circuit, so that the current went through his body, he was in the exercise of due care.   Indeed, as said by Matteson, C. J., in the former opinion:   "The deep burn upon the hand, and the evidence furnished by the autopsy that he had received a severe electric shock, with the certainty that these could have resulted only from his becoming grounded while in contact with a heavily-charged wire, or from his creating a short circuit for the current through his body, raise an inference that he was not exercising the high degree of care required in such a dangerous employment."   Such being the natural, and it may well nigh be said the necessary, inference relating to this branch of the case, and there being nothing to rebut it, we fail to see how a verdict in favor of the plaintiff, if one should be again obtained, could stand; for the burden of proving that the deceased was in the exercise of due care at the time when he received the injury rests upon the plaintiff.   And, as already said, the natural inference, from the nature and extent of said injuries, being to the contrary, the presumption that deceased was in the exercise of due care is overcome, and hence there is no evidence in support thereof.   The case of *Cassidy* v. *Angell*, 12 R. I. 447, as explained by *Judge* v. *Narr. Elec. Light. Co.*, *supra*, does not control, therefore, for the reason that the presumption of due care there referred to is sufficient to make out a *prima facie* case only when there is "nothing appearing to the contrary."

Here something does appear to the contrary, namely, that the deceased must have come in contact with a highly-charged wire, as aforesaid, or else that he must have created

a short circuit and thereby have received the injury. And the happening of the accident from either of said causes is, *prima facie*, inconsistent with the exercise of due care on the part of the deceased. Abner S. Tompkins, an expert electrician called by the plaintiff, says that the two things necessary to be looked out for in handling live wires are, "that you don't get grounded and that you don't make a short circuit; and that if you avoid these two things you are all right." He also testifies to the effect that it is absolutely necessary for one to use gloves in handling a wire with a dangerous current on.

The deceased could not have observed these precautions. He knew there was trouble with the wires at this place ; his business was that of a "trouble-hunter" in connection with telegraph wires ; he was an experienced lineman ; in reaching the top of the pole in question he was obliged to go through the heavily-charged electric wires of the defendant corporation, which were just below those of the telegraph wires that he worked upon ; he must have known of the imminent danger from coming in contact with a highly-charged wire or from making a short circuit, and that his safety, if not his life, depended upon his exercise of a very high degree of care in doing the work allotted to him. That the particular wires which he was sent to disentangle and fix were not in themselves dangerous did not, in view of the fact of their close proximity to highly-charged electric wires and also of the further fact that he knew there was trouble there, excuse him from exercising the high degree of care aforesaid. He knew, or ought to have known, that under these circumstances the wires which he was sent to repair were liable to be dangerous, and hence due care on his part required that he should have taken such precautions in handling them as would have rendered them harmless if they were found to be dangerous, as in fact they were. Failing in this regard, the defendant corporation, even though itself guilty of negligence in the premises, cannot be held liable for the sad and fatal result which followed.

There was no error in granting the nonsuit, and hence the petition for new trial is denied.

*Edwards & Angell and John P Fox,* for plaintiff.

*Walter B. Vincent,* for defendant.